United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WADE BENTON,<br>Plaintiff,<br>v.<br>CIVI BIOPHARMA HOLDINGS, INC., et al.,<br>Defendants. | Case No. 25-cv-01000-JST<br><br>**ORDER ON DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>Re: ECF Nos. 76, 77 |

Before the Court are motions to dismiss filed by Defendants CiVi Biopharma Holdings, Inc. and BTG International, Inc. ECF Nos. 76, 77. The Court will grant BTG's motion and deny CiVi's motion.

## I. BACKGROUND

The following facts are taken from the second amended complaint ("SAC"). Plaintiff Wade Benton founded Eicos Sciences, Inc. with Kevin Christal in 2016. ECF No. 73 ¶ 21. Eicos was founded to develop new uses for an orphan drug known as iloprost. *Id.* Because iloprost is a vasodilator, a drug that opens blood vessels and increases bloodflow, Eicos intended to use it to treat diseases and injuries characterized by restricted circulation and fibrosis. *Id.* ¶¶ 23, 28.

In 2018, Benton, along with Christal and the other Eicos stockholders ("the Eicos Sellers"), entered into a Stock Purchase Agreement ("SPA") with CiVi. *Id.* ¶ 29. Under the SPA, CiVi purchased all shares of Eicos. *Id.* Concomitantly, Benton and the Eicos stockholders entered into the Sellers' Representative Agreement ("SRA"), making Benton the Sellers' Representative and vesting Benton with certain rights and responsibilities pertaining to the sale of Eicos and the development and marketing of iloprost. *Id.* ¶ 30.

As consideration for the purchase of Eicos, CiVi agreed to pay Benton, as Sellers'

United States District Court
Northern District of California

Representative: (1) a $2,000,000.00 "Base Purchase Price" within 60 days of the FDA's approval of a New Drug Application ("NDA") of an Eicos-developed drug containing or derived from iloprost for use in the United States to treat systemic sclerosis, Raynaud's phenomenon, or idiopathic pulmonary fibrosis; and (2) "Milestone Payments" that would become due as Eicos-developed drugs met certain sales targets. *Id.* ¶ 31. Benton and Christal also agreed to become "Key Employees" of Eicos and/or CiVi after the purchase and at least until the FDA approved an Eicos-developed drug containing or derived from iloprost. *Id.* ¶ 35. If either left Eicos or CiVi prematurely, they would forfeit 50% of any Milestone Payments. *Id.*

Experiencing difficulties securing FDA approval for an iloprost-derived drug to treat systemic sclerosis, Benton and Christal decided to target frostbite. *Id.* ¶ 37. After receiving positive initial feedback from the FDA about the use of iloprost to treat frostbite, Benton, as the Sellers' Representative, and CiVi executed an Amendment Agreement ("the Amendment") adding frostbite to the list of treated conditions that would trigger CiVi's obligation to pay the Base Purchase Price and Milestone Payments. *Id.* ¶¶ 40–41. While negotiating the Agreement, Benton and Christal informed CiVi that they would not continue working to develop iloprost unless CiVi made the commitments in the Amendment. *Id.* ¶ 42.

Upon signing the Amendment, Benton and Christal continued to work on iloprost for Eicos/CiVi, securing FDA priority review for an iloprost-derived frostbite treatment in early 2023. *Id.* ¶ 43. The FDA approved Eicos's NDA for an iloprost-derived frostbite treatment on February 13, 2024, under the brand name Aurlumyn. *Id.* ¶ 45. As a result of the FDA's approval of Aurlumyn, the Base Purchase Price became due on April 13, 2024 under the SPA and the Amendment. *Id.* ¶¶ 50–52. Benton has since repeatedly demanded that CiVi pay the Base Purchase Price, including in writing. *Id.* ¶ 53. Despite Benton's repeated demands, CiVi has refused to pay the Base Purchase Price or provide assurances that it will pay any Milestone Payments. *Id.* ¶¶ 54–55.

On October 21, 2024, BTG's parent corporation, SERB SAS, announced that it had acquired the rights to Aurlumyn from CiVi ("the Assignment"). *Id.* ¶ 60. In the Asset Purchase Agreement ("APA") between CiVi and BTG, the SPA and the Amendment are listed as "excluded

liabilities" which CiVi will retain and remain responsible for. *Id.*¶ 62. The Assignment also required CiVi to indemnify BTG against claims arising out of the SPA or any other excluded liabilities. *Id.* ¶ 66. The APA, "in the form available to Benton, does not describe payments sufficient for CiVi to perform its obligations under the SPA." *Id.* ¶ 64.

The complaint was filed on January 1, 2025, and an amended complaint was filed on April 8, 2025. ECF Nos. 1, 13. The court dismissed Plaintiff's amended complaint without prejudice on December 15, 2025. ECF No. 60. Plaintiff filed the SAC on January 27, 2026. ECF No. 73. It asserts breach of contract, promissory estoppel, and declaratory judgment claims against CiVi, and an intentional interference with contractual relations claim against BTG. *Id.* CiVi and BTG moved to dismiss on February 2, 2026. ECF Nos. 76, 77. Benton opposed both motions. ECF Nos. 78, 79. CiVi and BTG both filed replies on February 24, 2026. The Court took the motions to dismiss under submission without a hearing per Civil Local Rule 7-1(b). ECF No. 97.

## II. JURISDICTION

The Court has subject matter jurisdiction under 28 U.S.C. § 1332(a).

## III. LEGAL STANDARD

### A. Rule 12(b)(2)

Under Federal Rule of Civil Procedure 12(b)(2), the court must dismiss an action if it does not have personal jurisdiction over the defendant. Fed. R. Civ. P. 12(b)(2). "In opposition to a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper." *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). Where "the motion is based on written materials rather than an evidentiary hearing, 'the plaintiff need only make a prima facie showing of jurisdictional facts.'" *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (quoting *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)). "Although the plaintiff cannot simply rest on the bare allegations of its complaint, uncontroverted allegations in the complaint must be taken as true. Conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." *Id.* (internal quotation marks and citations omitted).

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). "California's long-arm statute allows the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution." *Id.* Because the applicable state "statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." *Schwarzenegger*, 374 F.3d at 800–01.

Due process permits a court to exercise personal jurisdiction over a defendant only when "the defendant has sufficient minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Impossible Foods Inc. v. Impossible X LLC*, 80 F.4th 1079, 1086 (9th Cir. 2023) (internal quotation marks and citation omitted). "The strength of contacts required depends on which of the two categories of personal jurisdiction a litigant invokes: specific jurisdiction or general jurisdiction." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015). For the court to exercise specific jurisdiction, the lawsuit must arise out of or relate to the defendant's contacts with the forum. *Id.* In other words, there must be "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum state and is therefore subject to the state's regulation." *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

**B. Rule 12(b)(6)**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). A complaint need not contain detailed factual allegations, but facts pleaded by a plaintiff "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In considering the pending motions to dismiss, the court accepts as true sufficient factual allegations in the complaint, construing them in the light most favorable to the plaintiff. *Hunt v. PricewaterhouseCoopers LLP*, 159 F.4th 603, 611 (9th Cir. 2025). However, the Court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citation omitted).

## IV. DISCUSSION

### A. Benton's Standing to Sue as Sellers' Representative

CiVi's motion to dismiss is based solely on the argument that Benton lacks the authority to bring this lawsuit on behalf of all the Eicos stockholders in his capacity as the Sellers' Representative. ECF No. 76 at 9. Benton responds that the Sellers' Representative Agreement gives him, as the Sellers' Representative, the power to bring claims on behalf of the other sellers through the indemnification process laid out in the SPA, including litigation. ECF No. 79 at 10.

Benton's appointment as the Sellers' Representative and the Eicos stockholders' corresponding transfer of power to Benton is contained in the SRA, ECF No. 73-10. The SRA is governed by California law, while the SPA is governed by Delaware law. ECF No. 73-10 at 4; ECF No. 73-2 at 31. The parties agree (ECF No. 76 at 10; ECF No. 79 at 10–11) that the relevant section of the SRA is Section six, which provides:

> Authorization. Each Stockholder hereby authorizes the Sellers' Representative to (a) execute, deliver and perform each document to which the Sellers' Representative is or is intended to be a party, (b) exercise and enforce any or all rights, powers and remedies provided to the Sellers' Representative by the SPA, any applicable law or any other document, instrument or agreement, (c) appoint a Person to act as the Sellers' Designated Payee under the SPA, and to remove and replace any such Sellers' Designated Payee, and (d) take any other action under the SPA which it shall deem advisable in the best interests of the Stockholders. Each Stockholder agrees to be bound by all of the agreements of the Sellers' Representative contained in the SPA and by all other actions taken by the Sellers' Representative pursuant to the SPA.

ECF No. 73-10 at 3.

"When a dispute arises, courts [applying California law] must 'give effect to the mutual

United States District Court
Northern District of California

intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." *Calamco v. J.R. Simplot Company*, No. 2:21-CV-01201-KJM-CSK, 2025 WL 2050699, at *8 (E.D. Cal. July 22, 2025) (quoting Cal Civ. Code § 1636). The same is true under Delaware law: "[c]ontracts are to be interpreted as written, and effect must be given to their clear and unambiguous terms." *Shiftan v. Morgan Joseph Holdings, Inc.*, 57 A.3d 928, 934–35 (Del. Ch. 2012) (citation omitted).

The intention of the parties to the SRA to empower Benton as Sellers' Representative to pursue claims on behalf of the stockholders is clear and ascertainable. Specifically, SRA Section 6(b) authorizes the Sellers' Representative to "exercise and enforce any or all rights, powers and remedies provided to the Sellers' Representative by the SPA" and Section 6(d) allows him to "take any other action under the SPA which it shall deem advisable in the best interests of the Stockholders." ECF No. 73-10 at 3. The SPA, in turn, contains detailed indemnification procedures by which Seller Indemnitees may make claims for losses against the Buyer, including via litigation. ECF No. 73-2 at 27, 29–30; *see id*. at 29 (describing the preconditions after which "the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement"). SPA Section 7.4 states specifically that the "Buyer [CiVi] shall indemnify each Seller . . . *and their respective Representatives* . . . against . . . any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement." *Id.* at 27 (emphasis added). Notably, the preamble of the SPA defines "Sellers' Representative" as "Wade Benton as the representative to the Sellers, and not in his individual capacity . . . ." *Id*. at 2.[1] Because the SPA contains specific indemnification procedures by which the Eicos stockholders' representatives may make claims against CiVi, and because the SRA empowers the Sellers' Representative to exercise all powers assigned to him by the SPA and to "take any other action under the SPA which it shall deem advisable," the Eicos stockholders through the SRA empowered Benton as the

[1] "Representatives" is further defined "with respect to any Person" as "any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person." ECF No. 73-2 at 9. Even if Wade Benton were not explicitly defined as a representative to the Sellers, this language is easily broad enough to encompass his role.

Sellers' Representative to exercise the Sellers' indemnification rights provided to them by the SPA. As such, the SPA and SRA together provide Benton as Sellers' Representative with standing to sue to enforce the terms of the SPA.

Civi emphasizes the language of the "Direct Claims" section, which states that direct claims by indemnified parties "shall be asserted by the Indemnified Party." ECF No. 73-2. Civi understands this to require each seller to bring its own claim. ECF No. 76 at 10. The problem with this argument is that the Seller's Representative in his representative capacity *is* an indemnified party under the terms of the SPA. ECF No. 73-2 at 27 (providing that "Buyer shall indemnify each Seller and its Affiliates and their respective Representatives (collectively, the 'Seller Indemnitees')").

CiVi cites to several Delaware cases involving terms that conferred litigation standing on a stockholder's representative more broadly or explicitly than the SPA and SRA do here. *See, e.g.*, *Movora LLC v. Gendreau*, No. N23C-05-034 MAA CCLD, 2024 WL 5389423, at *3 (Del. Super. Ct. Jan. 23, 2025); *Coughlan v. NXP B.V.*, No. CIV.A. 5110-CC, 2010 WL 1531596, at *2 (Del. Ch. Apr. 15, 2010). CiVi argues that these cases imply that such strong language is necessary rather than just sufficient, but that argument is not persuasive. For example, in *Quarum v. Mitchell International, Inc.*, the sellers' representative was appointed "to act as agent and attorney-in-fact for the Sellers with full power and authority to take all action necessary or appropriate in any claims that might arise between [Buyer] and Sellers relating to the SPA . . . ." No. N19C-03-087-AML-CCLD, 2020 WL 351291, at *1 n. 1 (Del. Super. Ct. Jan, 21, 2020). The court in *Quarum* summarily accepted that this language gave the sellers' representative the power to sue on the sellers' behalf. *Id.* Defendant has not cited any authority *requiring* language naming the sellers' representatives "attorneys-in-fact" or "agents" or more thoroughly spelling out the sellers' representatives' power to bring claims. In any case, the SRA's language is actually analogous to that highlighted in *Quarum* and similar cases in that it permits the sellers' representative to "take all action necessary . . . relating to the SPA . . . ."

Delaware statutory law likewise does not require any particular authorizing language. CiVi cites to Del. Code Ann. tit. 8, § 261(a)(2)(i), which permits the appointment of sellers'

representatives in corporate mergers who may "take action on behalf of such stockholders . . . to enforce . . . the rights of such stockholders . . . on the terms and subject to the conditions set forth in the agreement . . . ." Nothing in this statutory provision makes the grant of authority to Benton under the SRA invalid, rather, it validates the breadth of the SRA's grant. The Eicos stockholders were well within their rights under Delaware law to appoint Benton and empower him to "take any other action under the SPA which [he] shall deem advisable . . . ." ECF No. 73-10 at 3.

Moreover, the SRA's assignment of the Eicos stockholders' indemnification rights under the SPA to Benton as Sellers' Representative is permissible under both California and Delaware law. Under California law, "choses in action which arise out of an obligation, [such as] breach of contract . . ." may be assigned. *Curtis v. Kellogg & Andelson*, 73 Cal. App. 4th 492, 504 (1999). "[An] assignment merely transfers the interest of the assignor. The assignee stands in the shoes of the assignor, taking his rights and remedies, subject to any defenses which the obligor has against the assignor prior to the notice of the assignment." *Johnson v. County of Fresno*, 111 Cal. App. 4th 1087, 1096 (2003) (citation and internal quotation omitted). Similarly, under Delaware law, an appointed sellers' representative may be empowered to enforce contracts and enter into settlements on behalf of others. Del. Code Ann. tit. 8, § 261(a)(2)(i); *see also Industrial Trust Co v. Stidham*, 42 Del. 339, 345 (1942) ("[A] right to damages for breach of contract is also assignable . . . ."). The Eicos stockholders were therefore entitled to assign their rights to make claims against CiVi for breach of the SPA to the Sellers' Representative.

As Plaintiff argues, "[t]he SPA provides, in so many words, for the exact situation where the buyer has breached its obligations under the SPA, failed to pay the Base Purchase Price, and the Sellers' Representative is seeking indemnification on behalf of and as the representative of the Eicos Sellers." ECF No. 79 at 12. Because the assignment of a right to sue for breach of contract is permissible, and the SPA and SRA show that the Eicos stockholders did so, the Court denies CiVi's motion to dismiss for lack of prudential standing under the SPA and the SRA.[2]

[2] Civi also raises the argument, largely for the first time in its reply, that the Sellers' Representative may not bring tort claims because they are not "provided by" or "under" the SPA. ECF No. 85 at 6. While Section 6(d) of the SRA does authorize the Representative to take only actions "under the SPA," ECF No. 73-10 at 3, the Court has concluded that the SPA authorizes the

**B. Personal Jurisdiction over BTG**

Turning to BTG's motion, BTG claims first that the Court lacks personal jurisdiction over BTG in this action. ECF No. 77 at 12–13. Benton responds that BTG's communications with Benton and Christal provide minimum contacts with California sufficient to establish specific jurisdiction. ECF No. 78 at 13–14. In the alternative, he argues that BTG and Civi are alter egos for the purposes of personal jurisdiction. *Id*. at 18–22. Both theories fail.

**1. Purposeful Direction**

As the Court explained in its order on the previous motions to dismiss, the Ninth Circuit uses the three-part minimum contacts test to determine whether a court has specific personal jurisdiction over a defendant:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802. "The plaintiff bears the burden of satisfying the first two prongs of the test." *Id.* If the plaintiff does so, "the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)).

Establishing purposeful direction in intentional tort claims requires showing that the defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, [and] (3)

---

Representative to pursue direct claims on behalf of the sellers based on the buyer's failure to "pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Seller Indemnitees based upon, arising out of, with respect to or by reason of . . . any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement," ECF No. 73-2 at 29. Civi does not engage with this language. Civi likewise does not engage with the SPA's provision that "[n]othing in this Section 7.10 shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled or to seek any remedy on account of any Party's fraudulent, criminal or willful misconduct." *Id*. at 30. Accordingly, the Court cannot conclude that Civi has met its burden to show that the authority conferred by the SPA excludes tort claims.

causing harm that the defendant knows is likely to be suffered in the forum state." *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069 (9th Cir. 2017) (citation modified).

In the Court's last order, it determined that BTG's intentional acts allegedly aimed at California did not cause the harm suffered by Plaintiff, failing the third prong of the purposeful direction test. The Court observed that Benton "alleges that BTG communicated with him in California after BTG signed the contract that forms the basis of Benton's intentional interference claim (the APA) . . . but he fails to allege that [this act] caused his injury—namely, CiVi's alleged breach of its contract with him—or that his injury arose out of" it. ECF No. 60 at 13. In opposing the present motion, Benton advances the same theory: that "BTG employees communicated with Mr. Benton, while he was found in this judicial district [California], to instruct him to deliver the FDA approval for Aurlumyn, associated clinical trial and application information, and other valuable assets transferred under the APA, to BTG's custody." ECF No. 78 at 14–15 (citing ECF No. 73 ¶¶ 15, 63). Benton now explains that "BTG's acquisition structure and directives substantially contributed to encouraging CiVi's continuous breach regarding its performance to pay the Base Purchase Price and preventing CiVi from providing assurances regarding Milestone Payments." *Id.* at 15 (citing ECF No. 73 ¶¶ 10, 62–70). But he has again entirely failed to show why the communication to Benton caused the harm suffered. As BTG points out, the APA transferring ownership of the assets to BTG had already been signed. ECF No. 77 at 15; *see* ECF No. 73 ¶ 63. Nothing about the communication to Benton or his digital transfer of the assets furthered that harm because the assets were already owned by BTG at that point and unavailable for Civi's use in satisfying its alleged debts to Benton. *Id.* That they had not yet been transferred to BTG's possession is immaterial. Accordingly, Benton has failed to demonstrate that the Court may exercise personal jurisdiction over BTG based on its purposeful direction at the forum state of an intentional act causing harm.

### 2. ALTER EGO LIABILITY

The Court permitted Plaintiff to file the SAC in part so Plaintiff could set forth facts supporting alter ego jurisdiction. BTG correctly argues that the assertions in the SAC are insufficient to establish that BTG is Civi's alter ego. ECF No. 77 at 15.

"[I]f . . . one corporation is the alter ego of another, the Court may 'pierce the corporate veil' jurisdictionally and attribute 'contacts' accordingly." *City and County of San Francisco v. Purdue Pharma, L.P.*, 491 F. Supp. 3d 610, 635 (N.D. Cal. 2020) (quoting *RAE Sys., Inc. v. TSA Sys., Ltd.*, No. C 04-2030 FMS, 2005 WL 1513124 (N.D. Cal. June 24, 2005) (citation omitted)).

> In order to demonstrate that an alter ego relationship exists, the plaintiff must make a prima facie case "(1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice."

*Id.* (quoting *Ranza*, 793 F.3d at 1073 (citation omitted)). "Disregarding the corporate entity is recognized as an extreme remedy, and courts will only pierce the corporate veil in exceptional circumstances." *Reynolds v. Binance Holdings, Ltd.*, 481 F. Supp. 3d 997, 1004 (N.D. Cal. 2020) (citation and internal quotation marks omitted).

An alter ego relationship may exist either between a parent and a subsidiary, or between "sister companies that . . . operate as part of a single enterprise." *Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 953 (N.D. Cal. 2015). The existence of such a relationship is necessary, but "not sufficient to establish personal jurisdiction over the parent on the basis of the subsidiaries' . . . contacts . . . ." *See id.* (quoting *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001)). Here, the SAC does not allege that BTG purchased CiVi, wholly or in part. Nor does it allege that BTG and CiVi are sister entities that operate under a common corporate umbrella. As such, Plaintiff's alter ego theory fails before reaching the two step test.

Regardless, Plaintiff fails to allege facts sufficient to establish a unity of interest. A unity of interest is established by factors including identical equitable ownership, the use of the same offices and employees, use of one as a conduit for the affairs of the other, failure to segregate corporate records, commingling of funds and other assets, identical directors and officers, and inadequate capitalization. *Daewoo Electronics America, Inc. v. Opta Corporation*, 875 F.3d 1241, 1250 (citing *Smith v. Simmons*, 638 F. Supp. 2d 1180, 1191 (E.D. Cal. 2009), *aff'd*, 409 Fed. Appx. 88 (9th Cir. 2010)). Given that the alter ego theory is an exceptional remedy, factual allegations that establish only a few of the factors are insufficient. *Compare Stewart*, 81 F. Supp. 3d at 956 (finding allegations of equitable ownership, sharing of offices and employees, and

significant overlap of executives insufficient for unity of interest) *with Purdue*, 491 F. Supp. 3d at 636–38 (finding unity of interest when parent corporation was alleged to completely control subsidiaries' high-level and day-to-day operations and finances, commingle funds, share "virtually identical officers and committee members, and "integrate[] its subsidiaries into a single economic unit").

Plaintiff in the SAC alleges that (1) BTG inadequately capitalized CiVi during the Acquisition in order to frustrate payment of the Base Purchase Price; and (2) that BTG "exercised practical control over [Aurlumyn] assets and operations in a manner that disregarded separateness." ECF No. 73 ¶¶ 11–14. Even assuming that these claims sufficed to establish their respective factors, Plaintiff has not met its burden to show an alter ego relationship given that there is no proof that BTG owns CiVi; that BTG and CiVi share employees, offices, or executives; that BTG and CiVi have commingled finances and records; or that BTG uses CiVi as a conduit for its affairs. *See Reynolds*, 481 F. Supp. 3d at 1007 ("[F]ailure to discuss a unity of interest factor weighs against the finding of alter ego liability.").

Because Plaintiff does not establish a unity of interest in the SAC, the Court need not reach the existence of any fraud or injustice.

Lastly, Benton again requests jurisdictional discovery to bolster his alter ego allegations. ECF No. 78 at 22. The Court previously denied jurisdictional discovery in its order dismissing the FAC because Plaintiff at that time averred that it had facts in hand to allege alter ego jurisdiction. ECF No. 60 at 13–14. Plaintiff has now had an opportunity to do so. When a "request for discovery is based on little more than a hunch that it might yield jurisdictionally relevant facts, its denial is within the district court's discretion." *Reynolds*, 481 F. Supp. 3d at 1010 (citation omitted). Nothing in the SAC gives the Court reason to think that jurisdictional discovery is appropriate in this case.

**CONCLUSION**

For the foregoing reasons, the Court DENIES CiVi's motion to dismiss and GRANTS BTG's motion to dismiss. Because Plaintiff has had an opportunity to amend his allegations as to personal jurisdiction over BTG, further leave to amend would be futile and the complaint is

United States District Court
Northern District of California

dismissed with prejudice as to BTG. *See, e.g. Mitsui O.S.K. Lines, Ltd. V. Swiss Shipping Line S.A.L.*, No. 17-CV-03394-MEJ, 2018 WL 1156771, at *4 (N.D. Cal. Mar. 5, 2018).

**IT IS SO ORDERED.**

Dated: August 10, 2026

JON S. TIGAR
United States District Judge